UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RICKY A. SPADE,

           Plaintiff,           CIV. S-03-1041 PAN

    v.

JO ANNE B. BARNHART,           Memorandum of Decision
Commissioner of Social
Security,

           Defendants.

—oOo—

    Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), plaintiff seeks review of a final decision of the Commissioner of Social Security denying plaintiff's application for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq.

    Both parties move for judgment on the record.

    The supplemental security income program established by Title XVI of the Act provides benefits to disabled persons

without substantial resources and little income.  42 U.S.C. § 1383. To qualify, a claimant must establish inability to engage in "substantial gainful activity" because of a "medically determinable physical or mental impairment" that "has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(A).  The disabling impairment must be so severe that, considering age, education, and work experience, the claimant cannot engage in any kind of substantial gainful work that exists in the national economy.  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner makes this assessment by a five-step analysis.  First, the claimant must not currently be working.  20 C.F.R. § 416.920(b).  Second, the claimant must have a "severe" impairment.  20 C.F.R. § 416.920(c).  Third, the medical evidence of the claimant's impairment is compared to a list of impairments that are presumed severe enough to preclude work; if the claimant's impairment meets or equals one of the listed impairments, benefits are awarded.  20 C.F.R. § 416.920(d).  Fourth, if the claimant can do his past work benefits are denied.  20 C.F.R. § 416.920(e).  Fifth, if the claimant cannot do his past work and, considering the claimant's age, education, work experience, and residual functional capacity, cannot do other work that exists in the national economy, benefits are awarded.  20 C.F.R. § 416.920(f).  The last two steps of the analysis are required by statute.  42 U.S.C. § 1382c(a)(3)(B).

////

Plaintiff applied for benefits in March 2001, at age 41 years, claiming disability due to "interhemispheric subdural hematoma, mutipal [sic] trauma," since November 29, 2000, when plaintiff was hit by an automobile while riding his bicycle. Tr. 37, 71-73, 92.

Plaintiff's claim was denied initially and upon reconsideration by the Social Security Administration.

In October 2002, after a hearing in September, an administrative law judge found that plaintiff last engaged in substantial gainful activity February 2001; that plaintiff has the severe impairments of "status post head injury with double vision, with residuals of right lower extremity atrophy of the right calf and thigh, hyperreflexia of the lower extremities and weakness and slight hypertonicity of the lower extremities . . . right sixth nerve palsy, traumatic; degenerative changes at the C5-6 and C6-7 levels of the cervical spine; an adjustment disorder; and alcohol dependence in sustained full remission;" that these impairments do not, alone or in combination, meet or equal a listed impairment; that plaintiff's subjective complaints "are not . . . fully credible;" that plaintiff has the residual functional capacity to perform work-related activities in the medium exertional range and is nonexertionally limited to the performance of "simple, routine tasks involving unskilled entry-level work, not involving frequent interaction with the public;" that plaintiff can perform his past relevant work "as a kitchen helper (dishwasher) and cook's helper (prep cook);" and therefore

that plaintiff is not disabled. Tr. 23-24.

This action follows the Appeals Council's March 2003 denial of plaintiff's request for review. Tr. 4-5.

This court must uphold the Commissioner's determination that a plaintiff is not disabled if the Commissioner applied the proper legal standards and if the Commissioner's findings are supported by substantial evidence. <u>Orteza v. Shalala</u>, 50 F.3d 748 (9th Cir. 1995). Substantial evidence is more than a mere scintilla but less than a preponderance; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Id</u>.

Plaintiff contends the administrative law judge erred by failing to (1) consider all of plaintiff's impairments at step two of the sequential analysis (specifically, failing to consider whether plaintiff's borderline intellectual functioning and dysthymia are severe impairments); (2) consider and find plaintiff's borderline intellectual functioning meets or equals Listing 12.05(c);[1] (3) credit plaintiff's testimony; and (4) include all of plaintiff's exertional and nonexertional limitations in his residual functional capacity assessment.

Plaintiff testified as follows. He graduated high school in 1978, then completed automotive trade school with a B average.

---

[1] Plaintiff does not challenge the administrative law judge's determination plaintiff's head injury does not meet or equal Listing 12.02 (Organic Mental Disorders) nor the judge's determination plaintiff's adjustment disorder does not meet or equal Listing 12.04 (Affective Disorders). Tr. 15.

4

Tr. 35.  He worked as a "choker" for a logging company, a construction laborer, and a prep cook.  Tr. 36.  During the summer before his accident, he worked as a cook on a fireline. Tr. 38.

Plaintiff was hit by a car while riding his bicycle at 5:30 p.m., November 29, 2000, and "left for dead" until 11:00 p.m.  Tr. 37.  Plaintiff no longer has peripheral vision in his right eye, his depth perception "is gone" and he sees double if he doesn't wear an eye patch.  Tr. 46-48.  Plaintiff has to wear the patch to read.  Tr. 48.  Bright lights bother his eyes, especially the right.  Id.  Plaintiff gets at least five migraine headaches a month, for which he takes over-the-counter medication.  Tr. 49-50.  The "problems" with plaintiff's left leg stopped "bothering" him about a year ago.  Tr. 50.

Plaintiff testified he does not get along well with strangers because he finds them "too judgmental;" this has gotten worse since the accident.  Tr. 50-51.  He testified he has trouble thinking and concentrating, and forgets what he's talking about or what he's doing; this didn't happen before the accident. Tr. 51.

Plaintiff takes Celexa to help control his stress. Plaintiff gets "stressed out a lot . . . but . . . Celexa's helped that."  Tr. 50.  Plaintiff stated "simple things are really hard for me to do . . . [b]ecause of my eye, mostly."  Id. When taking Celexa plaintiff is less likely to punch walls or hurt himself when frustrated.  Tr. 44-45, 50.

1    Plaintiff testified he has not used methamphetamine in
2 three or four years, since attending Narcotics Anonymous.  Tr.
3 45.  He  drinks "couple of beers a day at least."  Id.  It helps
4 him sleep.  Tr. 46.  Prior to his accident plaintiff drank six to
5 twelve beers a day.  Tr. 45-46.
6    Plaintiff lives in a house with his oldest brother; his
7 mother "lives in the house in the back."  Tr. 34-35, 40.
8 Plaintiff changes his sheets, sweeps his room, and microwaves one
9 meal a day.  Tr. 40-41.  He doesn't shop for food because his
10 mother provides it.  Tr. 41.  Plaintiff does not perform yard
11 work, participate in sports, pursue a hobby ("I use[d] to chip
12 arrowheads, but I can't do that now"), go to the movies, church
13 or any other organized activity.  Tr. 41-42.  He sometimes swims
14 in a nearby creek.  Tr. 44.  He owns a van but doesn't drive it
15 because he let his license lapse 12 years ago when he was
16 misdiagnosed with cancer.  Tr. 43.  Plaintiff relies on his bike
17 for transportation.  Tr. 44.  Plaintiff sometimes visits friends
18 and "sit[s] around, maybe have a beer, talk, listen to music or
19 watch TV."  Tr. 44.
20    Plaintiff contends the administrative law judge failed to
21 consider plaintiff's borderline intellectual functioning and
22 dysthymia at step two of the sequential analysis and, at step
23 three, that his intellectual functioning meets or equals the
24 criteria for listed impairment 12.05C (20 C.F.R., Pt. 404, Subpt.
25
26

P, App. 1),[2] which provides in pertinent part:

> **Mental retardation:** Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in **A**, **B**, **C**, **or D** are satisfied.
>
> . . . **C.**  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. . .

Plaintiff relies on his performance IQ score of 70 measured June 2001 by the Commissioner's consultative psychologist, Dr. Anita Kemp, Ph.D., in addition to his other mental and physical impairments as found by the administrative law judge.  Plaintiff's performance IQ score is prima facie evidence he meets the criteria of Listing 12.05C, including the assumption of borderline intellectual functioning before age 22 (see, e.g., Hodges v. Barnhart, 276 F.3d 1265, 1268-69 (11th Cir. 2001) (qualifying low IQ obtained at an older age creates rebuttable presumption of fairly constant IQ throughout life)).

The Commissioner concedes the administrative law judge failed expressly to consider plaintiff's borderline intellectual

---

[2] "Conditions contained in the 'Listing of Impairments' are considered so severe that they are irrebuttably presumed disabling, without any specific finding as to the claimant's ability to perform his past relevant work or any other jobs.  Claimants are conclusively disabled if their condition either meets or equals a listed impairment.  20 C.F.R. § [416.920(d)]." Lester v. Chater, 81 F.3d 821, 828 (9th Cir. 1996)(emphasis in original); see also, 20 C.F.R. §§ 416.925, 416.926.

functioning and dysthymia at step two but asserts this omission is insignificant because the judge (1) never found either impairment nonsevere, and (2) adequately considered both impairments as nonexertional limitations limiting plaintiff's residual functional capacity.[3]  The Commissioner further asserts the administrative law judge properly discredited plaintiff's IQ scores based on Dr. Kemp's assessment plaintiff may not have put forth his best effort during testing.[4]

---

[3]  The administrative law judge found at step four "there is no objective evidence to establish disability due to a depression or borderline intellectual functioning" (Tr. 20), but that plaintiff's combined mental impairments limit plaintiff's residual functional capacity as follows (Tr. 21):

> Nonexertionally, the undersigned determines, in light of the record as a whole, and giving the claimant the full benefit of every tenable doubt with regard to his adjustment disorder with anxious mood, dysthymia, and borderline intellectual functioning, [plaintiff] is limited to the performance of simple, routine tasks involving unskilled entry-level work, not involving frequent interaction with the public.  The record supports a finding that the claimant has the ability to perform the basic mental activities of unskilled entry-level work involving simple, routine tasks.

[4]  The administrative law judge stated (Tr. 17, 18, 20):

> Doctor Kemp indicated that the claimant did not appear to put forth his best effort during testing.  He gave up on some tasks before the time limit and stated that he could not do some tasks and did not try.  He was irritable and complained about the tasks.  He was oppositional to some of the tasks and wanted to know why he had to do them.  The examiner noted that it was likely that he would be able to score higher on the WAIS III and WMS III. . . . The Axis II diagnosis was of borderline intellectual functioning; however, it was based on current WAIS III scores which were judged to be a low estimate of his current ability. . . . The consultative examiner . . . noted that borderline intellectual functioning was based on WAIS III scores which were judged to be a low estimate of his current ability; she noted that it was likely that the claimant would be able to score higher on the WAIS II [sic] and WMS III, as he did not put forth his best effort during testing and was irritable, oppositional and complained about the tasks.

The administrative law judge failed adequately to consider plaintiff's borderline intellectual functioning and dysthymia by limiting such consideration to the assessment of plaintiff's residual functional capacity.  The step two determination that an impairment is severe guarantees its consideration throughout the remaining sequential analysis.  This is particularly significant where, as here, the claimant has multiple impairments.  The administrative law judge is required not only to "consider the combined effect of all . . . impairments without regard to whether any [one] impairment, if considered separately, would be of sufficient severity," but if the administrative law judge "find[s] a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process."  20 C.F.R. § 416.923.

The record supports a finding that both plaintiff's borderline intellectual functioning (discussed below) and dysthymia[5] are severe impairments, and the administrative law

---

[5] Substantial evidence supports a finding plaintiff's dysthymia is a severe impairment, particularly in combination with plaintiff's other multiple impairments.  The administrative law judge noted but did not rely upon the April 2001 diagnosis of psychiatrist William Weathers, M.D., conducted at the Commissioner's request, that plaintiff has both "dysthmyia, secondary, moderately severe," and an "adjustment disorder with anxious mood," with a Global Assessment of Functioning (GAF) score of 55.  Tr. 17, 20, 214.  A GAF 55 (51 to 60) denotes "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers).  Diagnostic and Statistical Manual of Psychiatric Disorders, Fourth Edition ("DSM-IV") (4th Ed. 1994) at p. 32.  Dr. Weathers also noted (but the administrative law judge did not) that plaintiff "reported to have occasional mood swings where he is more or less stable for several days and

judge erred in failing to make these findings at step two.  More significantly, for the reasons set forth below, the record supports a finding that plaintiff's combined impairments meet or equal the criteria of Listing 12.05C.

The record as a whole does not support the administrative law judge's finding plaintiff's IQ test results are invalid. While Dr. Kemp questioned the validity of plaintiff's test results–stating that plaintiff's "current WAIS scores . . . are judged to be a low estimate of [plaintiff's] current ability," and "[i]t is likely that [plaintiff] would be able to score higher on the WAIS III and WMS III" (Tr. 237)–she did not find the results invalid.  Rather, Dr. Kemp found that plaintiff's "ability to perform detailed and complex tasks is about 1 3/4 standard deviations below the mean based on his current FSIQ [Full Scale IQ], *if valid*" and concluded plaintiff is limited to "simple and repetitive tasks."  Tr. 241 (emphasis added).  The administrative law judge adopted this conclusion in finding plaintiff limited to "simple, routine tasks involving unskilled entry-level work."  Tr. 21.

////

////

////

---

then he will get into a very deep, dark depression."  Tr. 212-213.  The administrative law judge noted improvement of plaintiff's depression with Celexa (Tr. 21, 276), but such improvement is relative and does not preclude a determination plaintiff's depression is severe, that is, has "more than a minimal effect on [plaintiff's] ability to work," Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir. 1988).

Dr. Kemp questioned the validity of plaintiff's test results due to his "oppositional attitude"[6] yet found plaintiff's attitude a sufficiently constant personality trait to conclude plaintiff "may have difficulty accepting instructions from supervisors due to his reported history and his response to testing directions," and "[h]is ability to interact with coworkers and the public would be in the low normal range due to his irritability."  Tr. 241.  The administrative law judge found this assessment sufficiently reliable to conclude plaintiff is limited to performing work "not involving frequent interaction with the public."  Tr. 21.

Viewing the record as a whole–a vantage unavailable to Dr. Kemp but imperative for the Commissioner–it is reasonable to conclude that plaintiff's "oppositional attitude" is a consistent personality trait that would not be a significant variable upon retesting of plaintiff's IQ; that is, that plaintiff's testing demeanor reflects his habitual response to stressful situations. Both Dr. Kemp and psychiatrist William A. Weathers, M.D., who

---

[6] Dr. Kemp noted that plaintiff "appeared annoyed when he was told the length of the examination . . . He appeared annoyed throughout the examination and at times mildly angry.  For example, when he asked if he got a question right and I responded that I could not give him the answers, he stated 'that makes me mad.'  He commented at several points, 'I don't like this.'  He made derogatory comments about the questions and had an oppositional and angry attitude toward the testing. . . . He did not appear to put forth his best effort during the testing.  He gave up on some tasks before the time limit. He stated that he could not do some tasks and did not try.  He was petulant and complained about the tasks.  He was oppositional to some of the tasks and wanted to know why he had to do them.  During the second half of the testing he appeared tired, yawning and sitting back, appearing less alert."  Tr. 234, 237.

11

examined plaintiff April 2001, diagnosed an adjustment disorder. Tr. 241, 214.  Dr. Weathers described plaintiff as "[r]eally irritable but overall cooperative," yet still found his intellectual functioning "significantly reduced."  Tr. 214, 212. While he did not conduct formal IQ testing, Dr. Weathers found plaintiff "could not, after several tries, spell 'world' backwards.  Very slowly using his fingers, he is able to count backwards from ten to zero.  He very slowly and with deliberate thought was able to do simple two-step exercises, i.e., fold a piece of paper, put it on the floor, retrieve it, and then place it on the desk.  He did serial subtraction of sevens only to 93 [starting with 100].  He had great difficulty trying to reverse digit recall."  Tr. 213.  Additionally, there is evidence plaintiff's interpersonal style preceded his accident.  Plaintiff testified he had difficulties getting along with people before his accident (Tr. 50-51); even when examined in the emergency room following the accident, plaintiff was described as "combative and uncooperative" (Tr. 169, 203, 211).

     I conclude, therefore, that plaintiff's "oppositional" or "irritable" "style" is so integral to his personality that it fails to provide a legitimate basis for discrediting plaintiff's IQ test results.  The record demonstrates neither that plaintiff's IQ would be higher were he more "cooperative" nor, more significantly, that plaintiff is capable of greater cooperation.  Thus, I find substantial evidence does not support the administrative law judge's finding plaintiff's IQ test

results are invalid.

The same problem besets the administrative law judge's credibility assessment wherein he concluded, "Further reducing the credibility of the claimant are statements in the consultative psychological examiner [report] with regard to his failure to put forth his best effort during testing, and his opposition to some of the tasks, which rendered a portion of the psychological testing *less than valid*."  Tr. 22 (emphasis added). For the reasons stated, this is an inadequate basis for discrediting plaintiff.

The two additional reasons the administrative law judge discredited plaintiff's testimony are (1) "inconsistent statements" to Dr. Weathers and Dr. Kemp concerning "the continuity of [plaintiff's] substance use," and (2) "lack of medical documentation of an impairment which would cause extreme pain or pain which would compromise the claimant's ability to perform work-related activities."  Tr. 21-22.  Plaintiff does not challenge the administrative law judge's findings regarding plaintiff's pain and the issue is not relevant to the court's conclusions regarding plaintiff's mental impairments.

Regarding plaintiff's substance use, the administrative law judge stated, "Although the claimant told the psychiatric examiner that he does not use alcohol or marijuana, he told the psychological examiner that he . . . drinks about 2-3 beers to help him sleep daily.  He also stated that he . . . currently uses a couple of joints per week. (Exhibits 7F, 4F)."  Tr. 22.

The record supports the administrative law judge's finding that plaintiff's statements to Dr. Kemp June 2001 concerning his current alcohol and marijuana use (2-3 beers a day, a couple joints per week)[7] were inconsistent with the statements he made to Dr. Weathers April 2001 ("[h]e denied the use of any drugs currently").[8] However, the administrative law judge failed to mention that plaintiff's answers to the judge's questions at the hearing were consistent with his statements to Dr. Kemp concerning plaintiff's alcohol use (drinks 2 to 3 beers

---

[7] In June 2001, Dr. Kemp noted plaintiff's statements concerning substance abuse as follows (Tr. 235):

> He started using alcohol in high school and drinks about 2-3 beers to help sleep daily. Before the accident he was drinking a 12 pack of beer per day. He said that he was told by hospital staff than he had the DT's.
>
> He started using marijuana at age 13. Currently he uses a couple of joints per week. He smoked more heavily about 4 years ago and than he used about 1 oz. per month.
>
> He started using methamphetamine at age 25 and used up to about 3 years ago. He used a couple of lines on the weekend.
>
> He used some LSD about 10-15 years ago.
>
> This report of substance use differs from that in the Psychiatric Report of 4/25/021. There he stated that he "does not use alcohol" and does not use marijuana.

[8] In April 2001, Dr. Weathers noted plaintiff's statements concerning substance abuse as follows (Tr. 212):

> He was in the Shasta County Jail for 30 days for possession of marijuana and another time he was in the Shasta County Jail for 33 days for domestic violence. He denied the use of tobacco. He states that he does not use alcohol. In the past, he used marijuana and even experimented with cocaine, methamphetamine, and LSD. He denied the use of any drugs currently. He does drink coffee, tea, or caffeine drinks.

14

a day), and the administrative law judge failed to ask plaintiff about his marijuana use.[9]  Plaintiff's candor in responding to the administrative law judge's direct questioning–assuming plaintiff's inconsistency in responding to medical personnel was attributable to a lack of candor rather than a change in personal habits[10] or lapse in memory[11]–is significant and should have been noted in the judge's credibility assessment; the administrative law judge failed to develop and clarify the record concerning

---

[9]  At the September 2002 hearing plaintiff testified as follows in response to questioning by the administrative law judge (Tr. 45-46):

```
Q:   Do you use street drugs?
A:   No.
Q:   Did you use street drugs in the past?
A:   Yes.
Q:   What did you use in the past?
A:   I, I was on methamphetamines for years.
Q:   When is the last time you had methamphetamines?
A:   Three or four years ago.  I went to NA and got cleaned up
     and I've been, I've remained . . .
Q:   Do you [use] alcohol?
A:   Yes.
Q:   How much alcohol do you drink?
A:   A couple of beers a day at least.
Q:   The medical records show that before your accident you were
     drinking six to 12 beers a day?
A:   Yeah, yeah.
Q:   How long have you been drinking six to 12, how long were you
     drinking six to 12 beers a day?
A:   I don't, I don't remember.  I honestly don't know, a year or
     two, maybe.
Q:   You [no] longer drink six to 12 beers?
A:   No, uh-uh.  I drink a couple beers, and just to help me get
     to sleep because I have a hard time sleeping at night.
```

[10]  The record does not resolve this question.  It does not, for example, include information regarding when plaintiff was associated with Narcotics Anonymous.

[11]  Both Dr. Kemp and Dr. Weathers credited plaintiff's complaints of short and long term memory loss.

plaintiff's current marijuana use and the record is consistent regarding plaintiff's past substance abuse.

I find, therefore, that plaintiff's inconsistent statements to Drs. Weather and Kemp concerning his current alcohol use is not a compelling reason[12] to discredit either plaintiff's allegations or the record evidence of his mental and physical impairments.

Additionally, because substantial evidence does not support the administrative law judge's conclusion plaintiff's IQ test results are invalid, I find that plaintiff's performance IQ score, in combination with his other mental and physical impairments, meets or equals[13] the criteria for listed impairment 12.05C.

"This court has discretion to remand a case for further evidence or to award benefits.  Evidence should be credited and an immediate award directed where '(1) the ALJ failed to provide

---

[12] The Commissioner's reasons for rejecting a claimant's subjective complaints must be clear and convincing in the absence of affirmative evidence of malingering.  Morgan v. Commissioner of Social Sec. Administration, 169 F.3d 595, 599 (9th Cir. 1999).

[13] The Commissioner is required to find medical equivalence to a listed impairment if a claimant's "medical findings are at least equal in severity and duration to the listed findings."  20 C.F.R. § 416.926(a).  Equivalency can be established where either: (1) the claimant has an impairment described in the listings that does not exhibit all of the listing's medical findings or such findings are not of the requisite severity, provided "other medical findings related to [the] impairment ... are at least of equal medical significance;" or (2) the claimant has an impairment that is not described in the listings, or has a combination of impairments none of which meet or are medically equivalent to a listing, provided "the medical findings related to [the] impairment(s) are at least of equal medical significance to those of a listed impairment."  20 C.F.R. §§ 416.926(a)(1), (2).

legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.'" <u>Moore v. Commissioner of Social Security Administration,</u> 278 F.3d 920, 926 (9th Cir. 2002), quoting <u>Smolen v. Chater</u>, 80 F.3d 1273, 1292 (9th Cir. 1996).  All of these factors are met here.

Accordingly, plaintiff's motion for summary judgment is granted; defendant's motion for summary judgment is denied.  This matter is remanded to the Commissioner for payment of benefits. The Clerk of Court is directed to enter final judgment pursuant to sentence four of 42 U.S.C. § 405(g).

So ordered.

Dated:  July 6, 2005.

    /s/ Peter A. Nowinski
PETER A. NOWINSKI
Magistrate Judge